UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA          CRIMINAL NO. 17-cr-00063

VERSUS                            JUDGE FOOTE

BRANDON DE'VANTE BELL-BRAYBOY     MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Defendant Brandon De'Vante Bell-Brayboy ("Bell-Brayboy") is charged with conspiracy to possess with intent to distribute cocaine and heroin. The charges arose out of a traffic stop on I-20 in Webster Parish, Louisiana. Before the court is Defendant's Motion to Suppress. Doc. 20. For the reasons that follow, it is recommended that Defendant's motion be granted.

**Factual Background**

The testimony at an evidentiary hearing and dash camera video/audio establish the following facts. Louisiana State Police Trooper George Strickland was sitting on the shoulder of I-20 in his marked SUV working stationary patrol and monitoring eastbound traffic. Tr. 4. He saw a 2005 Toyota Solara passenger car traveling eastbound in the outside (right) lane of traffic. Id. The car was going approximately 70 miles per hour, the speed limit in the area, but when it passed Trooper Strickland the driver tapped his brakes to slow down to about 65 miles per hour. That caught Trooper Strickland's attention. Tr. 5.

Trooper Strickland pulled onto the interstate to follow the Solara. As Strickland was catching up to the car, he saw it move into the left lane to pass several tractor-trailers. Once Trooper Strickland caught up to the car, he began running a license plate check on the computer in his SUV. While Trooper Strickland was doing this, he watched the car move back into the right lane and, while doing so, the car's right side tires crossed the white fog line. Id.

Trooper Strickland decided to stop the car for improper lane usage. Trooper Strickland is not primarily interested in traffic enforcement. He is part of a team of state troopers who are tasked with criminal interdiction: stopping drug trafficking, human trafficking, and other criminal activity along I-20. Tr. 13-14. Strickland readily admitted he cannot pull over every vehicle he sees that commits a traffic violation: "We would be out there all night." Tr. 14.

Strickland first finished his computer check of the license plate, which was issued by the state of Georgia, and confirmed that the car was not stolen. He then initiated his emergency lights to stop the car for the traffic violation. Video 0:23. Trooper Strickland saw only one person in the car, the driver. He walked to the passenger side window to talk to him. Video 0:51. Strickland asked the driver for his license and explained the reason for the stop. Strickland asked the driver if he was sleepy, and the driver stated that he was fine. The driver provided a Georgia driver's license.

While Trooper Strickland was talking to Bell-Brayboy, he noticed the inside of the Solara was very clean. Id. There were no personal effects. The only thing Trooper

Strickland noticed was a backpack on the backseat that had "University of Alabama" emblazoned on it. Tr. 7.

Trooper Strickland knew from his license plate check that the car was registered to a female in Georgia. Tr. 6. When Strickland asked Bell-Brayboy about the owner of the car, he said that the car belonged to his sister. Video 2:20. Trooper Strickland never asked Bell-Brayboy his sister's name to see if it matched the name on the car's registration.

Trooper Strickland asked Bell-Brayboy about his travel itinerary. Bell-Brayboy said that he had gone to Houston for the weekend to work out with his personal trainer, and he was then headed home. Tr. 7. The traffic stop was made on a Tuesday night, and Trooper Strickland asked Bell-Brayboy if he had traveled to Houston on the previous Friday. Bell-Brayboy said yes. Trooper Strickland said the only luggage he saw in the passenger compartment was the backpack, and he found it "odd" that would be enough luggage for a four or five day trip. Id. Strickland did not ask Bell-Brayboy if he had any luggage in the trunk.

During their conversation, Bell-Brayboy was holding his cell phone in his hand and often broke eye contact with Trooper Strickland to stare at his phone. As Strickland and Bell-Brayboy talked about the travel itinerary, Bell-Brayboy attempted to answer a call he received. Trooper Strickland glanced at Bell-Brayboy's phone and noticed that the incoming phone number was not associated with a contact in Bell-Brayboy's phone. Trooper Strickland asked him to put the phone down. Bell-Brayboy told Strickland that he was just letting a friend know where he was located. Tr. 8. Strickland found it "odd" that a friend's

number was not listed as a contact. The two continued to talk, and Bell-Brayboy told Trooper Strickland that he was headed back to school in Tuscaloosa, Alabama and that he plays football for the University of Alabama. Tr. 8.

Trooper Strickland said that, after talking with Bell-Brayboy, he felt that Bell-Brayboy was being deceptive in his answers, and he believed Bell-Brayboy was involved in some type of criminal activity. Id. Strickland returned to his SUV to run Bell-Brayboy's driver's license and check his criminal history. Video 3:30. Everything came back clean, and the only criminal history was an assault charge. Strickland also checked on his computer for the football roster of the University of Alabama. Strickland found Bell-Brayboy's name associated with Alabama football from several years earlier, perhaps on the spring team, but he was not listed on the current roster. Tr. 8.

Trooper Strickland also ran a check of the car on the Automated License Plate Reader or "ALPR" system, which indicated that the car had traveled on I-10 westbound in the vicinity of Lake Charles, Louisiana the day before (Monday). Tr. 27. If true, this information seemingly contradicted Bell-Brayboy's statement that he traveled to Houston on Friday. However, Trooper Strickland never followed up with any questions to clarify that point.

Strickland continued to believe that Bell-Brayboy was involved in some type of criminal activity, so he contacted Trooper Brent Peart and Trooper Matthew Titus and asked one of them to provide backup. Trooper Strickland wanted to approach Bell-Brayboy and

ask for consent to search the car. Tr. 9. Troopers do not ask for consent unless they have backup.

During his conversation with one of the other troopers, Trooper Strickland said that Bell-Brayboy was pretty nervous. Video 9:30. Trooper Strickland also told the other trooper that Bell-Brayboy's only criminal history was an assault charge. Trooper Strickland can then be overheard saying, "It just doesn't make any sense." Video 10:52.

Once Trooper Titus arrived, Strickland exited his SUV and asked Bell-Brayboy to step out of his car. Trooper Strickland did not return Bell-Brayboy's driver's license, issue a ticket or warning, or advise Bell-Brayboy that he was free to leave. Instead, Strickland explained to Bell-Brayboy that the police worked the interstate every day "and see a lot of bad things." Strickland then asked Bell-Brayboy for consent to search the car. Bell-Brayboy refused. Strickland told Bell-Brayboy that refusing was completely within his rights, but "I also have the right to call a K-9 to the scene to run around the vehicle."

At this point, Trooper Brent Peart arrived on the scene. Strickland asked Peart to call for a K-9. Normally, Peart would have contacted Trooper Roger Cason and K-9 Rico, but they were unavailable. Peart made contact with Minden City Police K-9 officer Clint Smith and asked him to report to the scene. Tr. 9.[1]

---

[1] Troopers Strickland, Peart, Titus, and Cason primarily work I-20 in Bossier Parish, but because Cason was out of town, they had made arrangements with Officer Smith to be available if a K-9 was needed. As a result, Strickland and his team were working I-20 in Webster Parish, so they would be closer to Officer Smith and his K-9.

Officer Smith arrived at the scene about 20 to 22 minutes after he was called. Strickland gave Smith a brief description of what was going on. Smith then got K-9 Harley out of his vehicle and conducted an open-air search. Officer Smith told Trooper Strickland that there was a positive alert on the Solara near the rear quarter panels. Tr. 10.

The troopers began searching the car. Two after-market compartments were located behind the rear quarter panels. The troopers were able to pull back the plastic shells and saw what appeared to be contraband wrapped in duct tape inside the hidden compartments. Tr. 11. The troopers placed Bell-Brayboy under arrest.

The troopers decided to move the Solara to a safe location to recover the contraband, so they drove it to the Minden Police Department. They then opened the hidden compartments and found 10 duct-taped packages of cocaine and one package of heroin. The narcotics weighed about 11 kilograms (24 lbs.) total.

**Defendant's Motion to Suppress**

Bell-Brayboy argues in his Motion to Suppress (Doc. 20) that Trooper Strickland stopped his car without probable cause to believe a traffic offense had been committed. He also argues that Trooper Strickland unconstitutionally extended the traffic stop without reasonable suspicion until a drug sniffing K-9 could be brought to the scene. Bell-Brayboy's supplemental brief emphasizes his continued detention until the arrival of the K-9. Bell-Brayboy argues that the search of his car violated the Fourth Amendment, so all of the evidence found and incriminating statements made afterwards should be suppressed.

**The Traffic Stop**

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968)." United States v. Rosales-Giron, 592 Fed. Appx. 246, 250 (5th Cir. 2014); quoting United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id.

For a traffic stop to be justified at its inception, an officer need only have reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). Lawful cause to make a traffic stop exists when a defendant commits a traffic violation and a law-enforcement officer observes the violation. United States v. Khanalizadeh, 493 F.3d 479, 482 (5th Cir. 2007).

Terry's first prong is met in this case. Trooper Strickland testified that the Solara's right tires crossed the right fog line (Tr. 5), which was improper lane usage in violation of La. R.S. 32:79. There is no evidence to the contrary. The stop was lawful even if Strickland's subjective reason for the stop was to look for evidence of other crimes. "Whren

allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop." United States v. Cole, 444 F.3d 688, 689 (5th Cir. 2006). The legal justification for the stop must simply be "objectively grounded." Id. The evidence establishes objective grounds for this stop.

**Reasonable Suspicion for Continued Detention**

As to Terry's second prong, whether the officer's actions were reasonably related in scope to the circumstances that justified the stop, an officer's actions are not reasonably related if the officer detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless the officer develops reasonable suspicion of additional criminal activity in the meantime. United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). If the officer develops reasonable suspicion of additional criminal activity during the investigation of the circumstances that originally caused the stop, the officer may further detain the occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. Id.; United States v. Aguilera, 2014 WL 7404535, at *3 (N.D. Tex.).

An officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop. United States v. Pack, 612 F.3d 341, 349-350 (5th Cir. 2010). The officer may also ask about the purpose and itinerary of the occupant's trip as part of this investigation, because these questions are considered to be reasonably related in scope to the investigation of the circumstances that caused the stop. Id. An officer may ask questions on subjects unrelated

to the circumstances that caused the stop, so long as the unrelated questions do not extend the duration of the stop. Id. The reasoning behind this rule is that the Fourth Amendment protects against detention, not questioning. Id. Thus, no Fourth Amendment harm is done where the officer asks the occupant of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed. Id.

Bell-Brayboy argues that once Trooper Strickland determined that his driver's license was valid and there were no outstanding warrants, the additional 20-22 minutes of detention while waiting for a K-9 was illegal, citing Rodriguez v. United States, 135 S.Ct. 1609, 1611 (2015). The Government argues that reasonable suspicion justified the detention of Bell-Brayboy until the K-9 arrived. The Government argues that reasonable suspicion for continued detention existed based on the totality of the following facts:

- The car was registered to a third party;
- The interior of the car was clean and void of personal effects and luggage;
- Bell-Brayboy appeared nervous;
- Bell-Brayboy answered a phone call from a friend whose name was not saved in his phone;
- Trooper Strickland was unable to confirm that Bell-Brayboy was on the current roster for the University of Alabama's football team;
- Bell-Brayboy's stated itinerary was inconsistent with information provided by the ALPR system; and

- Bell-Brayboy was not taking the most direct route from Houston to Tuscaloosa.

The Government's factors will be evaluated independently and collectively.

**Vehicle Registered to a Third Party**

Driving a vehicle registered to a third party is often cited as one factor among many in establishing reasonable suspicion of drug trafficking. See, e.g., United States v. Bams, 858 F.3d 937, 944 (5th Cir. 2017). Trooper Strickland knew immediately before the traffic stop that the vehicle was registered to a female in Georgia. When asked about ownership of the vehicle, Bell-Brayboy stated that the vehicle belonged to his sister. Strickland did not inquire further. He could have, but did not, verify that the sister's name matched (or did not match) the name on the vehicle's registration. Accordingly, this factor provides little to no weight to the reasonable suspicion determination.

**The Car Was Too Clean**

Strickland testified that the car's interior was clean and contained no personal effects. The Government cites no cases to show that whether a car is clean and free from clutter can contribute to a finding of reasonable suspicion. At least one court has found that it was not suspicious for a vehicle to be "a mess" during a long drive spanning several states. United States v. Glenn, 204 F.Supp.3d 893 (M.D. La. 2016). But see United States v. Zapata-Ibarra, 212 F.3d 877 (5th Cir. 2000)(Wiener, J., dissenting and criticizing the courts for accepting virtually anything proffered by law enforcement as reasonable suspicion: "The vehicle was suspiciously dirty and muddy, or the vehicle was suspiciously squeaky-clean; the driver was

suspiciously dirty, shabbily dressed and unkept, or the driver was too clean; ....."(footnotes omitted).

It is difficult to see how having a clean and tidy vehicle is indicative of criminal activity. Many people keep clean cars. Moreover, Bell-Brayboy pointed out at the hearing that a photograph of the inside of the vehicle showed a paper bag containing chips and snacks, the presence of which Trooper Strickland agreed was consistent with a person making a long road trip. Tr. 24. Defendant's Ex. 1.

Trooper Strickland also found it odd that Bell-Brayboy did not have luggage inside the passenger compartment, given the four or five days he claimed to be away from home. However, Strickland never asked Bell-Brayboy if he had any luggage in the trunk. But even if there were no luggage in the trunk, that circumstance would be entitled to very little weight. United States v. Flores, 2017 WL 2937577, *7 (S.D. Tex.), citing cases.

**Bell-Brayboy Appeared Nervous**

The Government notes that Bell-Brayboy was said to be nervous during the stop. The only basis for the claim of nervousness in this case is Trooper Strickland's testimony. However, Trooper Strickland admitted during the hearing that the audio and video recording shows that Bell-Brayboy was talkative but seemed "pretty relaxed." Tr. 40. While waiting for the K-9 to arrive, the troopers spoke with Bell-Brayboy about Alabama football and all sorts of other matters. Id.

In viewing the video, the undersigned does not observe any excessive nervousness beyond that normally associated with an uninvited encounter with a state trooper on the side

of a busy highway.  United States v. Monsivais, 848 F.3d 353, 359 (5th Cir. 2017)(It is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity.); United States v. Spears, 636 Fed.Appx. 893, 902-903 (5th Cir. 2016)(non-descriptive, general statement that a driver was nervous is not sufficiently persuasive to create reasonable suspicion).  And, except in extreme cases, a driver's nervous behavior usually will not suffice to establish reasonable suspicion.  United States v. Santiago, 310 F.3d 336, 342 (5th Cir. 2002) (driver and passenger's nervous behavior and conflicting statements did not produce reasonable suspicion); United States v. Flores, 2017 WL 2937577 (S.D. Tex.).

**Call From A Friend Who Was Not In Phone's Contacts**

Trooper Strickland found it "odd" that Bell-Brayboy took a call from a "friend" when the phone's screen did not show the phone number assigned to an existing contact.  People often get new phones and have to re-enter their friends' contact information.  It may be that the fact was unusual or even odd, like a person wearing mismatched socks, but Trooper Strickland did not explain how the fact was suggestive of criminal activity.

**Not on Alabama's Football Team**

Bell-Brayboy told Trooper Strickland that he was a member of the University of Alabama's football team.  Strickland was skeptical, so after returning to his SUV to run a driver's license and warrants/criminal history check (all of which were clean), Trooper Strickland did internet research to determine whether Bell-Brayboy was a member of the

team. Strickland could not find Bell-Brayboy on a current roster, but did find him associated with the team in some capacity in a prior year.

What Strickland saw and learned from Bell-Brayboy's statements about being on Alabama's football team indicated nothing more than youthful aggrandizement. Bell-Brayboy probably hoped that his claimed status as a student athlete for a national champion program would cause Strickland to issue only a warning rather than a ticket. This fact may have indicated to Strickland that Bell-Brayboy was engaged in some puffery, but it did not do much to create reasonable suspicion of criminal activity.

**ALPR System**

Trooper Strickland testified that he checked the ALPR system (sometimes referred to as the BOSS system) to verify Bell-Brayboy's statements that he had driven the Solara to Houston the prior Friday. (The stop was on the Tuesday after Presidents Day.) The ALPR indicated that the car had traveled west on I-10 in the Lake Charles area the day before the stop.

Strickland did not ask Bell-Brayboy any questions in an effort to clear up the apparent discrepancy. Perhaps Bell-Brayboy departed Houston the day before the traffic stop, stopped in the Lake Charles area to visit the casinos, and then continued on to Tuscaloosa. Maybe Bell-Brayboy would have denied that the car had been driven in that area. We do not know, because Strickland never asked whether or why the car might have been on I-10 near Lake Charles the day before.

**Not The Most Direct Route**

Bell-Brayboy was stopped as he was traveling east on I-20 in north Louisiana, allegedly from Houston, Texas to Tuscaloosa, Alabama. Trooper Strickland found it "odd" that Bell-Brayboy was not using the shorter route along I-10 through Louisiana. Tr. 35. Strickland estimated that Bell-Brayboy was going about an hour out of his way.

Perhaps Bell-Brayboy was taking the slightly longer route to stop and visit friends or family along the way. Or he may have been among the many reasonable persons who choose the longer I-20 route to avoid the well-known traffic issues that plague the I-10 corridor through south Louisiana and Baton Rouge. But we do not know because Trooper Strickland did not ask Bell-Brayboy about it in an attempt to confirm or dispel his suspicion that Bell-Brayboy was being deceptive or engaged in illegal activity. A driver's apparent choice of a less direct route is simply not very indicative of drug trafficking or other criminal activity.

**The Trooper's Hunch**

Trooper Strickland testified that he "didn't know" what crime he suspected Bell-Brayboy of committing. Tr. 37. He knew it was not human trafficking because there was no one else in the car (unless they were tied up in the trunk). Id. He testified: "At that point I really felt like it was narcotics but I couldn't say for sure." Id. Strickland told another trooper via cell phone during the stop that Bell-Brayboy was nervous, that he "couldn't find him" on the Alabama roster, that Bell-Brayboy stated he was driving his sister's vehicle, and that he had an Alabama backpack in the vehicle. Tr. 9:30. When the other trooper asked

Strickland about Bell-Brayboy's "CH", Strickland reported only "assault." Strickland concluded: "It just doesn't make any sense." The other trooper replied: "No, I agree."

Trooper Strickland obviously believed the driver was suspicious, but he couldn't articulate what crime may have been committed or provide specific facts for why he suspected the driver. He merely had an unexplained hunch that something was afoot. It turned out that he was correct, but an officer must have more than a mere hunch that a person stopped is engaged in illegal activity if he wishes to lawfully detain him beyond the time reasonably necessary to handle the traffic offense. United States v. Broca-Martinez, 855 F.3d 675, 678 (5th Cir. 2017).

**Additional Detention Was Unconstitutional**

The Government argues that it was lawful for Trooper Strickland to detain Bell-Brayboy on the roadside, to allow time for the K-9 to arrive, for more than 20 minutes after all matters related to the traffic offense (license and warrant check, etc.) had been resolved. The law allows an officer to continue the detention of a motorist beyond the time needed to investigate the circumstances that caused the stop (crossing the fog line) only if the officer has developed reasonable suspicion the motorist is involved in other criminal activity. Such reasonable suspicion allows the officer to continue the detention for a reasonable time while he attempts to confirm or dispel that reasonable suspicion. Brigham 382 F.3d at 506; United States v. Urban, 2017 WL 3702016 at *8 (N.D. Tex.).

"Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts,

reasonably warrant the ... seizure." United States v. Macias, 658 F.3d 509, 519-20 (5th Cir. 2011). "The suspicion required to justify such a detention need not rise to the level of probable cause but must be based on more than an unparticularized suspicion or hunch." Id.

"Factors such as nervousness, inconsistent stories, criminal history, use of another's vehicle, an out-of-state driver's license and license plates, and presence on a known drug-trafficking corridor may not suffice to create reasonable suspicion of criminal activity." United States v. Davis, 620 Fed. Appx. 295, 298 (5th Cir. 2015). "Instead, to constitute 'articulable facts that support a reasonable suspicion' of wrongdoing, such factors must be coupled with 'more concrete evidence that suggests the commission of a specific offense.'" Id., quoting United States v. Cavitt, 550 F.3d 430, 437 (5th Cir. 2008). The undersigned finds, after reviewing the totality of the circumstances, that Trooper Strickland did not have reasonable suspicion, by the time he completed his routine computer checks and other tasks associated with the traffic offense, to justify additional detention of Bell-Brayboy.

Examples from other cases are merely illustrative, as reasonable suspicion is fact-intensive and turns on the circumstances of a particular case. Davis, 620 Fed. Appx. at 299. But the Fifth Circuit's decision in United States v. Spears is an example that shares enough similarities with this case to warrant a more detailed review for the sake of comparison. Spears, 636 Fed.Appx. at 901-902. The driver in that case was stopped for a traffic offense after he was seen leaving a house that was under watch for drug activity. Within 16 minutes, the tasks related to the traffic offense were completed, but police officers detained the driver more than 23 additional minutes while the officers tried to obtain a

drug-sniffing dog. The Government claimed that additional reasonable suspicion arose that justified the detention: the defendant lied about where he was coming from; he appeared nervous; he was evasive, non-compliant, and argumentative; and there was a backpack inside his vehicle in plain view. Id.

With regard to the purported lie, the Court found no basis to conclude the defendant's statements as untrue. The Court also stated that minor, insignificant, illusory, or reconcilable inconsistencies in a defendant's story are not probative of criminal activity. As to the defendant's nervousness, the only evidence of nervousness was the officer's testimony. The Government pointed out that Mr. Spears did not give straight answers; refused to step outside of his vehicle; initially avoided answering a question about whether there was a weapon in the vehicle; and protested when asked to sit in the back of a patrol car. The Fifth Circuit stated that such behavior is not a proper response to law enforcement and is pertinent in determining reasonable suspicion, but such behavior is not necessarily indicative of criminal wrongdoing. As to the backpack, the Court stated that it is common to see backpacks in vehicles, and the multitude of innocent uses for a backpack rendered its presence of little persuasive value.

The Fifth Circuit found that the totality of the circumstances did not create reasonable suspicion of criminal activity. Law enforcement detained the defendant longer than the time reasonably required to issue a traffic violation and address related safety concerns. Therefore, the district court erred in denying the defendant's motion to suppress. Judge Costa concurred. He found it was a "close call" whether the officers had reasonable

suspicion that the defendant was involved in drug trafficking. But even if there was reasonable suspicion, the traffic stop was unreasonably long (about 40 minutes).

In this case, the facts argued by the Government are not as indicative of criminal activity as those rejected in Spears. And a few simple questions by Trooper Strickland might have confirmed or dispelled his concerns about Bell-Brayboy's travel itinerary and answers to the trooper's earlier questions. Instead, Strickland completed all matters related to traffic stop for crossing the fog line within about 14 minutes after the stop. He then requested consent to search the car. When Bell-Brayboy declined to consent, Strickland called for a K-9 and detained Bell-Brayboy for 20-22 minutes to wait for the dog.

None of the factors pointed to by Trooper Strickland, individually or collectively, amounted to reasonable suspicion of criminal activity beyond the driver crossing the fog line, which led to the stop. The continued detention beyond the time reasonably required to complete the mission of issuing a traffic ticket, without reasonable suspicion, for more than 20 minutes while waiting for the K-9 to arrive violated Bell-Brayboy's constitutional shield against an unreasonable seizure. It bears noting that a dog sniff is not part of the mission of issuing a traffic ticket. United States v. Spears, 636 Fed.Appx. at 901, citing Rodriguez, 135 S.Ct. at 1615-16 (rejecting a *de minimis* rule that would have allowed officers to prolong a stop for just a few minutes while waiting for a K-9 to arrive because any unjustified prolonging of the stop is unlawful).

**Bell-Brayboy's Incriminating Statements**

Following the discovery of the illegal narcotics, Bell-Brayboy made incriminating statements to the DEA and attempted to cooperate with authorities and make a controlled delivery of the narcotics to Atlanta. However, the agents were unable to attempt the controlled delivery due to timing and a lack of information. The evidence of Bell-Brayboy's statements and attempted cooperation must also be suppressed under the "fruit of the poisonous tree" doctrine. United States v. Hernandez, 670 F.3d 616, 623 (5th Cir. 2012).

Bell-Brayboy was advised of his rights per Miranda, and he signed a waiver form (Govt. Ex. 2; Tr. 51-52), but the temporal proximity of his statements to the illegal road-side search and seizure is too close. Immediately after the troopers saw contraband in the hidden compartments, Bell-Brayboy was arrested and transported to the Minden Police Department where, about 30 minutes later, he was interviewed by a DEA agent. There were no intervening events of any significance between those two events. If the statements were admitted at trial, the purposes of exclusionary rule would not be served. Id.

Accordingly;

IT IS RECOMMENDED that Defendant's Motion to Suppress (Doc. 20) be granted and that all evidence recovered as a result of the unconstitutional search and seizure, including Defendant's incriminating statements, be suppressed.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this

Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 3rd day of October, 2017.

Mark L. Hornsby
U.S. Magistrate Judge